**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **DALE WESTMORELAND,** | § | Civil Action No. 4:25-cv-05571 |
| | § | |
| **Plaintiff,** | § | |
| | § | **DEFENDANT/COUNTER-PLAINTIFF** |
| **v.** | § | **JENSEN RANCHES, INC.'S** |
| | § | **COUNTERCLAIMS** |
| **JENSEN RANCHES, INC.** | § | |
| | § | |
| **Defendant.** | § | **JURY TRIAL DEMANDED** |

Defendant/Counter-Plaintiff Jensen Ranches, Inc. ("Jensen Ranches" or "Counter-Plaintiff"), by and through its undersigned counsel, files these Original Counterclaims against Plaintiff/Counter-Defendant Dale Westmoreland ("Westmoreland" or "Counter-Defendant") and respectfully states as follows:

## I.     PARTIES

1.      Counter-Plaintiff Jensen Ranches, Inc. is a Texas corporation in Houston, Texas within Harris County. Deer Dancer Ranch, located at 1204 Jensen Ranch Road, Alleyton, Colorado County, Texas 78935.

2.      Counter-Defendant Dale Westmoreland is an individual who resides in the State of Texas.

## II.     JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over Counter-Defendant's claims under 28 U.S.C. § 1331 because Counter-Defendant brought claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, thereby establishing federal-question jurisdiction.

4.      This Court has supplemental jurisdiction over Jensen Ranches' Counterclaims under 28 U.S.C. § 1367 because these counterclaims arise out of the same case or controversy as

1

Counter-Defendant's claims—namely, the employment relationship between Jensen Ranches and Westmoreland, and Westmoreland's performance and conduct as Ranch Manager of Deer Dancer Ranch. The Counterclaims share a common nucleus of operative fact with Counter-Defendant's claims, as they involve the same parties, the same employment period, the same ranch, and the same set of facts and circumstances that gave rise to Counter-Defendant's termination.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to these counterclaims occurred within the Southern District of Texas, and Deer Dancer Ranch is located in Alleyton, Colorado County, Texas, which falls within this District.

## III.    FACTUAL BACKGROUND

### A. *Westmoreland's Hiring and Employment Agreement*

6.      Deer Dancer Ranch is a working ranch that maintains and breeds high-value livestock, including red deer, buffalo, horses, and exotic animals.

7.      Westmoreland was employed by Jensen Ranches, Inc. as the Ranch Manager at Deer Dancer Ranch from approximately November 15, 2023, through October 26, 2024.

8.      On or about November 3, 2023, Jensen Ranches and Westmoreland entered into a written Ranch Manager Employment Agreement (the "Employment Agreement"), pursuant to which Westmoreland was hired to serve as Ranch Manager at Deer Dancer Ranch, with a start date of November 15, 2023.[1] Under the Employment Agreement, Westmoreland received an annual salary of $36,000, paid in biweekly installments, plus a $1,500 moving allowance. *See* Ex. A. Jensen Ranches also provided Westmoreland with a four-bedroom, two-bath mobile home on

---

[1] A true and correct copy of the Employment Agreement is attached hereto as **Exhibit A**.

the ranch property at no cost, the estimated annual value of which, including utilities, was approximately $24,500. *Id.*

9.      The Employment Agreement and an accompanying document titled "Responsibilities of Ranch Manager" (the "Rancher Responsibilities") set forth Westmoreland's duties in specific and detailed terms.[2] Westmoreland was required to feed, water, groom, and care for all livestock and exotic animals on the ranch. *See* Ex. A; Ex. B.  He was required to examine the health of the animals daily and provide basic medical care as needed. *Id.* He was required to identify and enter livestock into the FarmBrite software system to identify breeding genetics. *Id.* He was required to record information about the health, feeding, and costs of animals. *Id.* He was further required to check water gaps weekly and after all rains, check all outside fence lines each week, and maintain ponds and water troughs for the animals. *Id.*

10.      The Employment Agreement further required Westmoreland to ensure that animals were fed first thing in the morning, with daily checks on animals and water troughs Monday through Saturday. *See* Ex. A. Westmoreland was required to check the inventory of deer pellets, hay, and horse chow and to ensure supplies did not run out. *See* Ex. B. He was responsible for daily and weekly reporting via email, including a daily work report and paddock report sent to Dr. Jensen and other designated personnel, including Barry Hughes. *Id.* He was responsible for pasture management and irrigation in accordance with a provided schedule. *Id.*

11.      The Rancher Responsibilities expressly stated that failing to accurately count all animals in the park and paddocks daily, and not reporting sick, injured, or dead livestock or horses on the ranch — including failing to send photos of dead or injured livestock immediately — would constitute grounds for immediate termination. *Id.*

---

[2] A true and correct copy of the Rancher Responsibilities is attached hereto as **Exhibit B**.

12.    Westmoreland signed the Employment Agreement on November 3, 2023. Ex. A. The Rancher Responsibilities document required Westmoreland to initial multiple provisions acknowledging his understanding and acceptance of the ranch rules and protocols. Ex. B. By accepting the position, Westmoreland attested that he could perform all required physical activities listed in the agreement.

### B.    The Handover Packet and Westmoreland's Failure to Follow it

13.    Westmoreland's predecessor as Ranch Manager was Austin Borchardt, who had served in that role from 2020 until he voluntarily departed on good terms in 2023. Before Borchardt left, he prepared and delivered to Westmoreland a detailed written Handover Packet (the "Handover Packet"), approximately ten pages in length, that contained specific instructions on how to operate the ranch, including guidance on animal care, feeding protocols, pasture rotation, herd identification, and other essential management practices.[3]

14.    Despite receiving the Handover Packet, Westmoreland told Borchardt that he had never found time to read it. When Borchardt returned to the ranch in late 2024, he found the Handover Packet exactly where he had left it nearly a year earlier, apparently untouched.

15.    Throughout his tenure, Westmoreland repeatedly contacted Borchardt for guidance on matters that were specifically addressed in the Handover Packet. Beginning approximately one month into his employment, Westmoreland called Borchardt approximately every two weeks to ask questions about ranch operations that were clearly outlined in the packet. On multiple occasions, Westmoreland claimed he was never told to perform certain tasks, despite those tasks being specifically addressed in the Handover Packet and in his Employment Agreement.

---

[3] A true and correct copy of the Handover Packet is attached hereto as **Exhibit C**.

### C. *Failure to Maintain Animal Nutrition and Health*

16.    Throughout Westmoreland's tenure as Ranch Manager, the animals under his care suffered serious and visible malnutrition. By as early as September 2023—less than a year after Westmoreland began managing the ranch—multiple animals on the ranch were in visibly poor condition. On a Body Condition Score ("BCS") scale of 1 to 5, with 1 representing the poorest condition, Borchardt rated the animals at a score of 1. The deer were described as "very boney," with visible ribs, and their hair was falling out—a recognized symptom of severe malnutrition.





17.    Westmoreland did not maintain proper feeding practices. The standard feeding requirement for the deer was five pounds of dry food per deer per day, which was outlined in the Basic Feed and General Care Instructions given to Westmoreland at the very beginning of his employment.[4] Westmoreland failed to follow this protocol, resulting in drastic weight loss and hair loss across the herd due to starvation. He failed to recognize these obvious signs of malnutrition or take corrective action.

---

[4] A true and correct copy of the Basic Feeding and General Care Instructions is attached hereto as **Exhibit D**.

18.     Westmoreland also failed to implement any form of pasture rotation, causing at least one paddock to be completely grazed off down to bare dirt. This contributed to the starvation of animals in that paddock and ultimately required the paddock to be replanted at Jensen Ranches' expense. When Borchardt visited the ranch and observed the overcrowded, stripped paddock, he informed Westmoreland that the animals had to be moved because they had nothing to eat. Westmoreland's response was that "no one was telling him to do it," despite the fact that pasture management was explicitly part of his contractual duties and was addressed in the Handover Packet.

19.     In October 2024, while Westmoreland was hospitalized, Dr. Jensen asked Pamela Urban—a neighboring ranch manager with a Bachelor of Science in Animal Science from Sam Houston State University and approximately seven years of experience managing exotic animals, including red deer—to assist with feeding the animals on the ranch. During the approximately two weeks that Urban helped with feeding, she immediately noticed that the majority of the animals looked very underweight. She also noticed that several animals had thin, falling hair, which she identified as a symptom of malnutrition. Urban observed no other signs that would explain the hair loss, such as diarrhea or other indicators of parasitic infestation.

20.     Urban also discovered a baby red deer that Westmoreland had penned up behind a building with a broken leg. Westmoreland had placed a splint on the fawn's leg, but the splint had not been changed and was cutting into the fawn's skin as the animal grew. Urban identified this as a failure to provide appropriate veterinary follow-up. The fawn subsequently died. A veterinarian who examined the fawn determined that the fawn did not die from the condition Westmoreland attributed the death to, but rather from other underlying health issues. Westmoreland disregarded the veterinarian's professional assessment.

7

21.     Urban also reported that, in addition to the fawn with the broken leg, there was a fawn and another deer that were not doing well. Urban informed Westmoreland about the condition of these animals. Westmoreland did nothing, and both animals died.

22.     Additionally, Westmoreland never wormed the deer through feed or drenching—a standard and essential herd health practice that was part of his duties.

23.     In total, multiple animals died or suffered severe deterioration as a direct result of Westmoreland's neglect during his tenure.

24.     Moreover, the severe malnourishment that the herd suffered under Westmoreland's care has caused lasting harm beyond the immediate weight loss and death loss. Prolonged malnutrition in deer stunts their physical growth and development, permanently diminishing their size, antler quality, and overall commercial value.

25.     These effects are not limited to the animals that were malnourished during Westmoreland's tenure; malnourished does produce weaker offspring with reduced growth potential, meaning that the damage to the herd's value extends to future generations of deer born from the affected animals. The diminished condition of the breeding stock has therefore reduced not only the current market value of the herd but also the projected future value of the ranch's breeding program.

26.     Additionally, three fawns from top breeding lines died under Westmoreland's care as a result of his neglect, each valued at approximately $10,000.

27.     The death of these animals was the direct result of Westmoreland's poor handling. Borchardt noted that Westmoreland's blatant neglect in care and feeding could have caused—and did cause—unnecessary death loss among the herd.

28.     Borchardt confirmed that three stags—including stag number 14 and stag number 204, the latter of which Borchardt described as "massive"—were killed because Westmoreland failed to separate two different age groups of deer in the same pen and failed to tranquilize and cut their antlers before the rut.  Borchardt had specifically instructed Westmoreland that the two age groups needed to be separated before the older stags lost their velvet, because the larger animals would kill the younger ones if left together. Westmoreland never separated them, and the larger stags killed the smaller ones. Borchardt confirmed that this outcome could have been avoided or mitigated had Westmoreland followed his instructions.

29.     Additionally, approximately one week after Borchardt returned to the ranch, a large two-year-old deer—one of the biggest two-year-olds Borchardt had ever seen on the ranch with an immense commercial value—died after its antlers became entangled in hoses that Westmoreland had left strung out in the pens. Borchardt confirmed that the deer's death was directly attributable to Westmoreland's failure to maintain a safe environment within the pens by removing debris and equipment.

### D.  Failure to Tag and Identify Deer and Maintain Breeding Records

30.     One of Westmoreland's core contractual obligations was to identify and enter livestock into the FarmBrite software system to track breeding genetics, and to record information about the health, feeding, and costs of the animals. *See* Ex. A; Ex. B. Westmoreland was also given a Basic Breeding Outline at the beginning of his employment, which set out all of the guidelines and expectations for this practice.[5]

31.     This function was critical to the operation of Deer Dancer Ranch because the ranch maintained a herd of red deer whose individual pedigree and genetic lineage had significant

---

[5] A true and correct copy of the Basic Breeding Outline is attached hereto as **Exhibit E**.

commercial value.

32.    Westmoreland entirely failed to perform this duty. He did not tag or record any fawns born during his tenure, did not maintain birth counts, and did not collect DNA samples.

33.    As a direct result of Westmoreland's failure to tag and identify fawns at birth and document their parentage, the pedigree and genetic lineage of the animals born during his tenure could not be verified.

34.    This caused a permanent loss of documented pedigree value for an entire generation of deer, which directly diminished the commercial and breeding value of the herd.

35.    Furthermore, Westmoreland failed to perform any artificial insemination ("AI") work during the 2024 breeding season, despite this being a scheduled and critical component of the ranch's breeding program. Borchardt confirmed that by September 2024, Westmoreland had done nothing to prepare for or execute the AI work. Because the AI breeding window is seasonal and time-sensitive, Westmoreland's failure resulted in the loss of an entire year of planned genetic improvement—a loss that cannot be recovered.

### E.  Failure to Follow Ranch Protocols and Respond to Instructions

36.    When Westmoreland's failures and their consequences were identified and brought to his attention, he failed to correct them. On multiple occasions, when the poor condition of the animals was raised as unacceptable, Westmoreland's response was dismissive. When told that the animals' poor condition was unacceptable and that there was no excuse for it, Westmoreland replied: "well they can just fire me."

37.    Westmoreland at one point ceased responding to and communicating with Barry Hughes, a deer broker and wildlife expert who maintained deer at the ranch and with whom regular communication was required under ranch protocols. Hughes, who is an expert in wildlife

management and who personally maintained deer at Deer Dancer Ranch, independently advised Dr. Jensen that Westmoreland should be let go because of the poor quality of his work.

38.     Westmoreland also failed to maintain equipment properly. Multiple pieces of equipment were damaged through misuse, and repairs were done incorrectly. Among other items, the Polaris Ranger utility vehicle was damaged due to Westmoreland's improper use and lack of maintenance, and the boom arm on a ranch truck was damaged, requiring approximately $20,000 in repairs. Westmoreland's failure to maintain equipment led to extensive and costly repairs.

39.     On multiple occasions, Westmoreland informed Borchardt that he did not know what to do because "no one would tell him what to do." Borchardt reminded Westmoreland on more than one occasion that, as Ranch Manager, it was his responsibility to manage the ranch as needed without constant supervision, and that the failure of someone to issue him an affirmative instruction was not an excuse for inaction.

### F. Westmoreland's Overall Incompetence and the Resulting Harm

40.     Borchardt, who had served as Ranch Manager both before and after Westmoreland, found Westmoreland to be incompetent in his role. Borchardt specifically stated that the health and safety of the animals was the "number one role" of the Ranch Manager's job, that the animals were the highest-value assets on the property other than the land itself, and that if the animals did not have care from the Ranch Manager, they had no care at all.

41.     Pamela Urban, based on her professional training in animal science, her direct observations of the ranch's animals, and her personal interactions with Westmoreland, concluded that Westmoreland was not suitable for the ranch management role and stated she would not hire him. Urban observed that Westmoreland's prior experience had been with cattle, not with deer, and that he demonstrated an arrogant attitude and resistance to guidance. Urban noted that

Westmoreland exhibited the attitude that the ranch owner had "no say over how he took care of" the animals and that Dr. Jensen should merely "sign checks and that's it."

42.     Westmoreland's blatant neglect of the animals' health created the risk of legal liability for Jensen Ranches. Borchardt observed that the condition of the animals under Westmoreland's care was so poor that it could potentially be characterized as animal cruelty if observed by the wrong person, thereby exposing Jensen Ranches to potential legal problems. Additionally, Westmoreland told Borchardt that he wanted to be fired.

43.     Westmoreland's failures also created undue operational hardship for Jensen Ranches. Despite no longer being an employee of Jensen Ranches during part of the relevant period, Borchardt was repeatedly called upon to consult with and assist Westmoreland, and to be on-site at the ranch to address problems that Westmoreland should have been able to handle independently. Additionally, Westmoreland's incompetence led to delays in planned management activities and increased costs due to repairs that had to be made as a result of his mismanagement.

44.     As a further example of Westmoreland's disregard for ranch protocols and safety, Westmoreland and/or his wife brought their young child into the deer paddocks, which posed serious safety risks given that the ranch housed red deer stags and buffalo—animals that are especially dangerous, particularly during breeding season.

## IV.     COUNTERCLAIMS

### A. *Count 1: Breach of Employment Agreement*

45.     Jensen Ranches incorporates by reference all preceding paragraphs as if fully set forth herein.

46.     On or about November 3, 2023, Jensen Ranches and Westmoreland entered into the Employment Agreement, which was a valid and enforceable contract between the parties.

Westmoreland also received and acknowledged the Rancher Responsibilities document, which further detailed his obligations.

47.     Under the Employment Agreement and the Rancher Responsibilities, Westmoreland was obligated, among other things, to: (a) feed, water, groom, and care for all livestock and exotic animals; (b) examine the health of animals daily and provide basic medical care; (c) identify and enter livestock into the FarmBrite software system to track breeding genetics; (d) record information about the health, feeding, and costs of animals; (e) implement pasture rotation and follow the pasture management schedule; (f) check water gaps, fence lines, and water troughs on a regular basis; (g) maintain daily and weekly reporting; (h) maintain communication with Dr. Jensen, Barry Hughes, and other designated personnel; (i) properly operate, repair, and maintain equipment; and (j) accurately count all animals in the park and paddocks daily.

48.     Jensen Ranches fully performed its obligations under the Employment Agreement, including paying Westmoreland's salary, providing the ranch residence, paying for utilities, providing equipment, and providing Westmoreland with all necessary tools, instructions, and support to perform his duties.

49.     Westmoreland materially breached the Employment Agreement in the following respects, among others:

    a.  He failed to properly feed and care for the animals, resulting in severe malnutrition, drastic weight loss, and hair loss across the herd.

    b.  He failed to examine animals daily and provide appropriate medical care, including failing to worm the deer through feed or drenching, failing to properly manage a fawn's broken leg splint (contributing to the fawn's death), and failing to act when informed by Urban that a fawn and another deer were not doing well (resulting in the death of both animals).

    c.  He failed to tag, record, or identify any fawns born during his tenure, failed to maintain birth counts, and failed to collect DNA samples, resulting in a permanent loss of pedigree documentation.

d.  He failed to perform any artificial insemination work during the 2024 breeding season, resulting in the loss of an entire year of planned genetic advancement.

e.  He failed to implement any pasture rotation, causing at least one paddock to be completely grazed off and requiring replanting.

f.  He failed to examine animals daily and provide appropriate medical care, including failing to properly manage a fawn's broken leg splint, contributing to the fawn's death; and failing to act when informed by Urban that a fawn and another deer were not doing well, resulting in the death of both animals.

g.  He failed to maintain adequate communication with Dr. Jensen, Barry Hughes, and other designated ranch personnel, including the failure to send daily reports as required under the Employment Agreement.

h.  He failed to properly operate and maintain ranch equipment, causing damage to multiple pieces of equipment including the Polaris Ranger.

i.  He failed to follow the instructions in the Handover Packet and failed to follow ranch protocols and instructions when they were communicated to him.

50.  As a direct and proximate result of Westmoreland's breaches of the Employment Agreement, Jensen Ranches suffered damages including, but not limited to: loss of livestock; loss of pedigree and genetic documentation value; loss of breeding potential from the missed AI season; costs of replanting destroyed pasture; costs of repairing equipment damaged by Westmoreland; costs of engaging third parties (including Borchardt and Urban) to assist with ranch operations that Westmoreland failed to perform; and other economic losses.

**B. Count 2: Negligence (Failure to Properly Feed and Maintain Animals)**

51.  Jensen Ranches incorporates by reference all preceding paragraphs as if fully set forth herein.

52.  **Duty**. As Ranch Manager, Westmoreland owed a duty of reasonable care to Jensen Ranches to properly feed, water, and maintain the livestock and exotic animals on Deer Dancer Ranch. This duty was established by the Employment Agreement, the Rancher Responsibilities,

14

and the general standard of care applicable to a person undertaking the management and care of livestock. The Employment Agreement specifically required Westmoreland to feed and water animals first thing each morning, with daily checks on animals and water troughs. The Rancher Responsibilities required Westmoreland to ensure that feed supplies did not run out and to maintain adequate nutrition for all animals.

53.    **Breach**. Westmoreland breached this duty by failing to follow proper feeding practices, failing to maintain the required five pounds of dry food per deer per day, apparently failing to count fawns when calculating feed quantities (thereby systematically underfeeding the entire herd), failing to implement any pasture rotation (causing the total loss of grazing in at least one paddock), failing to ensure the ranch's water supply was functioning, and failing to recognize and respond to visible signs of extreme malnutrition, including drastic weight loss and hair loss.

54.    **Causation**. Westmoreland's failure to properly feed and maintain the animals was a proximate cause of the severe malnourishment of the herd. The animals' BCS dropped to 1 on a scale of 1 to 5, their ribs were visibly protruding, and their hair was falling out. These conditions led to lower conception and birth rates, likely miscarriages among malnourished does, and unnecessary death loss among the animals, including the deaths of multiple deer during Westmoreland's tenure. Additionally, the prolonged malnourishment permanently stunted the growth and development of affected animals, reducing their size, antler quality, and commercial value. Because malnourished does produce weaker offspring with diminished growth potential, the harm extends to future generations, compounding the economic loss to Jensen Ranches.

55.    **Damages**. As a direct and proximate result of Westmoreland's negligent failure to properly feed and maintain the animals, Jensen Ranches suffered damages including loss of

15

livestock, diminished breeding capacity, costs of rehabilitating malnourished animals, costs of replanting destroyed pasture, and related economic losses.

### C. Count 3: Negligence (Failure to Monitor Animal Health and Prevent Malnourishment)

56.     Jensen Ranches incorporates by reference all preceding paragraphs as if fully set forth herein.

57.     **Duty**. As Ranch Manager, Westmoreland owed a duty of reasonable care to Jensen Ranches to monitor the health of the ranch's animals on a daily basis and to take appropriate action when animals showed signs of illness, injury, or malnourishment. The Employment Agreement required him to examine the health of animals daily and to provide basic medical care. The Rancher Responsibilities required him to accurately count all animals in the park and paddocks daily and to immediately report sick, injured, or dead livestock.

58.     **Breach**. Westmoreland breached this duty by failing to observe, recognize, or act upon visible and obvious signs of severe malnourishment and declining health across the herd. He failed to worm the deer through feed or drenching—a standard and essential herd health practice. He failed to properly manage a fawn with a broken leg, allowing a splint to go unchanged until it cut into the fawn's growing skin. He disregarded a veterinarian's professional assessment regarding the cause of a fawn's death. He failed to take corrective action even after the poor condition of the animals was brought to his attention by Borchardt and others.

59.     **Causation**. Westmoreland's failure to monitor animal health and prevent malnourishment was a proximate cause of the animals' deterioration, the deaths of multiple animals—including a fawn with a broken leg, and a separate fawn and deer that Urban warned Westmoreland about and that subsequently died after he took no action—and the overall decline in herd health and condition during his tenure.

16

60.    **Damages**. As a direct and proximate result of Westmoreland's negligent failure to monitor animal health and prevent malnourishment, Jensen Ranches suffered damages including loss of livestock, veterinary expenses, costs of rehabilitating malnourished animals, and diminished herd value.

### D. Count 4: Negligence (Failure to Tag and Document Deer at Birth)

61.    Jensen Ranches incorporates by reference all preceding paragraphs as if fully set forth herein.

62.    **Duty**. As Ranch Manager, Westmoreland owed a duty of reasonable care to Jensen Ranches to identify, tag, and document all fawns born on the ranch, to maintain birth counts, to collect DNA samples, and to enter this information into the FarmBrite software system to track breeding genetics. This duty was explicitly set forth in the Employment Agreement and was a core function of the Ranch Manager position because the commercial value of the ranch's deer herd depended on verifiable pedigree and genetic lineage.

63.    **Breach**. Westmoreland entirely failed to perform this duty. He did not tag or record any fawns born during his tenure, did not maintain birth counts, and did not collect DNA samples. He also failed to perform any artificial insemination work during the 2024 breeding season, despite this being a planned and time-sensitive component of the ranch's breeding program.

64.    **Causation**. Westmoreland's failure to tag, identify, and document fawns at birth directly and proximately caused a permanent loss of documented pedigree value for an entire generation of deer born on the ranch during his tenure. Because fawns must be tagged and their parentage recorded at or near birth to maintain verifiable lineage, this failure cannot be retroactively cured. Additionally, the missed AI breeding season resulted in the permanent loss of an entire year of planned genetic advancement for the herd.

65. **Damages**. As a direct and proximate result of Westmoreland's negligent failure to tag and document deer at birth, Jensen Ranches suffered damages including loss of pedigree value, loss of documented genetic lineage, loss of an entire year of breeding genetics, and diminished commercial value of the herd.

### E. Count 5: Negligence (Failure to Follow Ranch Protocols and Instructions)

66. Jensen Ranches incorporates by reference all preceding paragraphs as if fully set forth herein.

67. **Duty.** As Ranch Manager, Westmoreland owed a duty of reasonable care to Jensen Ranches to follow the ranch protocols, instructions, and guidelines set forth in the Employment Agreement, the Rancher Responsibilities, and the detailed Handover Packet prepared by his predecessor. These protocols and guidelines were provided to Westmoreland to ensure the proper care and management of high-value livestock, the maintenance of ranch equipment and property, and the safe operation of the ranch.

68. **Breach.** Westmoreland failed to follow ranch protocols and instructions in numerous respects. He never read the Handover Packet despite it being provided to him and being only approximately ten pages in length. He failed to maintain the required daily and weekly reporting. He failed to maintain communication with designated ranch personnel, including ceasing communication with Barry Hughes entirely. He failed to properly operate and maintain ranch equipment, causing damage to multiple pieces of equipment, including the Polaris Ranger. He brought or allowed his wife and young child into the deer paddocks in violation of ranch safety protocols, which prohibited children and minors from being unsupervised near dangerous animals. When errors were identified and brought to his attention, he failed to correct them.

69.     **Causation.** Westmoreland's failure to follow ranch protocols and instructions was a proximate cause of the harm suffered by Jensen Ranches. His failure to read and follow the Handover Packet contributed to his inadequate animal care, his failure to implement pasture rotation, and his failure to perform required herd identification procedures. His failure to maintain equipment caused damage requiring costly repairs. His failure to maintain communication disrupted ranch operations and business relationships.

70.     **Damages.** As a direct and proximate result of Westmoreland's negligent failure to follow ranch protocols and instructions, Jensen Ranches suffered damages including costs of equipment repair and replacement, operational disruptions, increased costs due to the need for third-party consultants and assistants, and other economic losses.

## F. Count 6: Gross Negligence (Failure to Properly Feed and Maintain Animals)

71.     Jensen Ranches incorporates by reference all preceding paragraphs as if fully set forth herein.

72.     As set forth above, Westmoreland owed a duty of care to Jensen Ranches to properly feed and maintain the ranch's animals. His failure to do so constituted not merely ordinary negligence, but gross negligence under Texas law.

73.     Westmoreland's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. The animals under Westmoreland's care were high-value livestock whose survival and well-being depended entirely on the Ranch Manager's attentiveness. Westmoreland's failure to follow established feeding protocols—including failing to provide the required daily ration of feed and failing to implement any pasture rotation—created an extreme risk of starvation, death, and permanent harm to the herd.

19

74. Westmoreland was actually and subjectively aware of the risk created by his conduct but proceeded with conscious indifference to the rights, safety, and welfare of the animals and of Jensen Ranches. The signs of starvation, including visible ribs, extreme weight loss, and hair loss, were obvious to any observer and were, in fact, pointed out to Westmoreland by Borchardt and others. Despite being told that the animals' poor condition was unacceptable, Westmoreland responded: "well they can just fire me." This response demonstrates conscious indifference to the welfare of the animals and the resulting harm to Jensen Ranches.

75. As a direct and proximate result of Westmoreland's gross negligence, Jensen Ranches suffered damages including loss of livestock, diminished breeding capacity, likely miscarriages among malnourished does, permanently stunted growth and reduced commercial value of surviving animals, diminished value of future offspring from malnourished breeding stock, costs of rehabilitation, costs of replanting destroyed pasture, and related economic losses. Jensen Ranches is entitled to recover exemplary damages under Texas Civil Practice and Remedies Code § 41.003.

### G. Count 7: Gross Negligence (Failure to Monitor Animal Health and Prevent Malnourishment)

76. Jensen Ranches incorporates by reference all preceding paragraphs as if fully set forth herein.

77. As set forth above, Westmoreland owed a duty of care to Jensen Ranches to monitor the health of the ranch's animals daily, provide basic medical care, and take appropriate corrective action when animals showed signs of illness or declining health. His failure to do so constituted gross negligence under Texas law.

78. Westmoreland's conduct involved an extreme degree of risk. His failure to monitor animal health resulted in animals deteriorating to the point that they showed visible signs of severe

20

malnourishment—conditions that multiple witnesses described as potentially constituting animal cruelty if observed by authorities. His failure to change a fawn's splint, and his disregard of a veterinarian's professional assessment, contributed to the fawn's death. His failure to act when Urban informed him that a fawn and another deer were not doing well resulted in the deaths of both animals. His failure to worm the deer exposed the entire herd to preventable parasitic conditions.

79.     Westmoreland was actually and subjectively aware of the risk. He was personally informed by Borchardt that the animals were in unacceptable condition. He was informed by Urban that the fawn with the broken leg had a worsening condition. He was also informed by Urban that a separate fawn and another deer were not doing well, yet he did nothing and both animals died. He was advised by a veterinarian that a fawn had died from health issues unrelated to the cause Westmoreland assumed. Despite all of these warnings, he failed to take corrective action and instead displayed conscious indifference by responding dismissively, including stating "well they can just fire me" when confronted about the animals' condition.

80.     As a direct and proximate result of Westmoreland's gross negligence in failing to monitor animal health and prevent malnourishment, Jensen Ranches suffered damages including loss of livestock, veterinary costs, costs of rehabilitating malnourished animals, and diminished herd value. Jensen Ranches is entitled to recover exemplary damages under Texas Civil Practice and Remedies Code § 41.003.

### H. Count 8: Gross Negligence (Failure to Tag and Document Deer at Birth)

81.     Jensen Ranches incorporates by reference all preceding paragraphs as if fully set forth herein.

21

82.     As set forth above, Westmoreland owed a duty of care to Jensen Ranches to identify, tag, and document all fawns born on the ranch and to maintain breeding records. His complete failure to do so constituted gross negligence under Texas law.

83.     Westmoreland's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Jensen Ranches. The pedigree and genetic lineage of each animal is a core component of the animal's commercial value. Failure to tag and document fawns at or near birth results in a permanent and irrecoverable loss of documented pedigree because the parentage can no longer be verified after the fact. Westmoreland, as Ranch Manager, was specifically charged with this responsibility and was aware that it was a critical part of his job.

84.     Westmoreland was actually and subjectively aware of the risk created by his conduct but proceeded with conscious indifference. Despite his contractual obligation to identify and enter livestock into the FarmBrite system and to record health and breeding information, he failed to tag a single fawn, failed to maintain any birth counts, and failed to collect any DNA samples during his entire tenure. He also failed to perform any AI work for the 2024 season despite knowing it was a seasonal and time-sensitive responsibility, resulting in the loss of an entire year of planned genetic improvement. These were not isolated oversights; they reflected a complete and sustained abandonment of a core job function over the course of approximately eleven months.

85.     As a direct and proximate result of Westmoreland's gross negligence, Jensen Ranches suffered damages including permanent loss of pedigree documentation, loss of genetic lineage records, loss of a full year of breeding genetics, and diminished commercial value of the herd. Jensen Ranches is entitled to recover exemplary damages under Texas Civil Practice and Remedies Code § 41.003.

### I.   *Count 9: Gross Negligence (Failure to Follow Ranch Protocols and Instructions)*

86.   Jensen Ranches incorporates by reference all preceding paragraphs as if fully set forth herein.

87.   As set forth above, Westmoreland owed a duty of care to Jensen Ranches to follow the ranch protocols, instructions, and guidelines set forth in his Employment Agreement, the Rancher Responsibilities, and the Handover Packet. His systemic failure to do so constituted gross negligence under Texas law.

88.   Westmoreland's conduct involved an extreme degree of risk. The ranch protocols existed to ensure the health and safety of high-value livestock, the proper operation of expensive equipment, and the safety of individuals on the ranch property. By failing to read or follow the Handover Packet, by failing to correct errors after they were identified, by failing to maintain equipment, and by bringing a young child into paddocks housing dangerous animals, Westmoreland created extreme risks to the animals, to the ranch's property and equipment, and to the safety of individuals on the ranch.

89.   Westmoreland was actually and subjectively aware of the risk. He was repeatedly told by Borchardt that his conduct was inadequate and that the animals' condition was unacceptable. He was told specifically which tasks needed to be performed. He was provided detailed written instructions and protocols. Yet he chose not to read the Handover Packet, refused to follow instructions when given, and when confronted, stated that he either did not know what to do because "no one would tell him," or that the ranch could "just fire" him. This pattern of willful disregard constitutes conscious indifference to the rights and welfare of Jensen Ranches.

90.   As a direct and proximate result of Westmoreland's gross negligence in failing to follow ranch protocols and instructions, Jensen Ranches suffered damages including equipment

repair and replacement costs, increased operational costs, and other economic losses. Jensen Ranches is entitled to recover exemplary damages under Texas Civil Practice and Remedies Code § 41.003.

## V.     DAMAGES

91.     As a direct and proximate result of Westmoreland's breaches of the Employment Agreement, negligence, and gross negligence as set forth above, Jensen Ranches has suffered the following categories of damages:

a.  **Loss of Livestock**. Multiple animals under Westmoreland's care died as a direct result of his neglect, including: three a fawns from top breeding lines, valued at approximately $10,000 each, totaling **$30,000**; four stags—three (including stag number 14 and stag number 204) that killed each other because Westmoreland failed to separate them or cut their antlers as instructed by Borchardt, and a fourth (a large two-year-old) that died after becoming entangled in hoses Westmoreland left in the pens—valued at approximately $35,000 each, totaling **$140,000** in immediate replacement value alone. Moreover, each of these stags had a breeding lifespan of more than ten years and the capacity to sire approximately ten fawns per year with multiple females, for a projected yield of approximately 100 offspring per stag over its breeding life. Assuming approximately half of those offspring would be female (valued at approximately $5,000 each) and half male (valued conservatively at approximately $20,000 each), the lost lifetime breeding potential of each stag is estimated at approximately **$1,250,000**—representing approximately $250,000 in female offspring value and $1,000,000 in male offspring value. The aggregate loss of lifetime breeding potential from the four lost stags is therefore

24

substantial and ongoing. Additional animals suffered severe malnourishment, and Borchardt confirmed that because Westmoreland kept no birth or death records, the full extent of animal deaths during his tenure is unknowable.

b. **Loss of Pedigree Value**. Westmoreland's failure to tag, identify, and document fawns born during his tenure caused a permanent loss of documented pedigree and genetic lineage for an entire generation of deer, reducing the commercial value of affected animals by approximately tenfold. Animals with verified pedigrees can sell for tens of thousands of dollars, while those without may sell for only a couple of thousand. Additionally, Westmoreland's botched DNA testing paperwork required Jensen Ranches to pay approximately $55 per head a second time for roughly 50 animals, totaling approximately **$2,750** in duplicative costs. Because Westmoreland failed to tag fawns in the paddocks when they were born, the parentage of those animals can never be determined after the fact, further diminishing their value. The failure to properly enter deer data into the FarmBrite system (and the inaccuracy of such data as was entered) has required Borchardt to spend approximately 300 hours to date correcting, reconstructing, and remediating the records, work that is still ongoing. That remedial time has also diverted Borchardt from revenue-generating activities such as selling deer. Based on Borchardt's annual salary of $52,000 and an estimated work schedule of 50 hours per week, approximately six weeks of his time (representing approximately 12% of his annual salary) has been consumed by this remedial work, at a cost of approximately **$6,240**.

25

c. **Loss of Breeding Potential**. Westmoreland's failure to perform artificial insemination work during the 2024 breeding season resulted in the loss of an entire year of planned genetic improvement, a loss that cannot be recovered.

d. **Costs Incurred Due to Westmoreland's Conduct**. Jensen Ranches incurred costs to replant the paddock that was completely grazed off due to Westmoreland's failure to implement pasture rotation. Jensen Ranches incurred costs to repair equipment damaged by Westmoreland's improper use and maintenance, including approximately **$3,000** for the Polaris Ranger and approximately **$20,000** for the boom am on the ranch truck. Jensen Ranches incurred costs to redo botched DNA testing at $55 per head for approximately 50 animals. Jensen Ranches incurred costs by engaging Borchardt and Urban to consult on and assist with ranch operations that Westmoreland failed to perform.

e. **Diminished Future Value of the Herd**. The severe malnourishment suffered by the herd under Westmoreland's care has permanently stunted the growth and development of the affected animals, reducing their size, antler quality, and commercial value. Because malnourished does produce weaker offspring with reduced growth potential, the damage extends beyond the current generation to future offspring, diminishing the long-term breeding value and projected revenue of the entire herd.

f. **Other Economic Damages**. Jensen Ranches suffered additional economic harm, including delays to planned management activities, increased operational costs, and potential liability exposure resulting from the condition of the animals under Westmoreland's care.

26

## VI.    PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff Jensen Ranches, Inc. respectfully requests that this Court enter judgment in its favor and against Counter-Defendant Dale Westmoreland as follows:

a.    Actual and compensatory damages in an amount no less than $1,451,990;

b.    Exemplary damages pursuant to Texas Civil Practice and Remedies Code § 41.003 for Westmoreland's gross negligence;

c.    Pre-judgment interest at the maximum rate allowed by law;

d.    Post-judgment interest at the rate provided by 28 U.S.C. § 1961;

e.    Costs of court;

f.    All other relief, at law or in equity, to which Jensen Ranches may be justly entitled.

Dated: April 3, 2026

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

 */s/ Daniel D. Pipitone*
**Daniel D. Pipitone**
Attorney in Charge
dpipitone@munsch.com
SDTX Federal No. 294
Texas Bar No. 16024600
700 Milam Street, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1415

**ATTORNEY FOR DEFENDANT JENSEN RANCHES, INC.**

**OF COUNSEL:**

**Melanie Madden**
mmadden@munsch.com
SDTX Federal No. 3928155
Texas Bar No. 24145291
700 Milam Street, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1415

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Motion has been served upon all other parties via the court's electronic filing system on this 3rd day of April, 2026.


*/s/ Daniel D.Pipitone*
Daniel D. Pipitone

28